**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

ANTHONY LAMAR                                                                    PLAINTIFF
ADC #120479

                              **Member Case No.: 4:21-CV-00529**
v.                            **Master Case No.: 4:21-CV-00347**

ASA HUTCHINSON, *et al.*                                                      DEFENDANTS

<u>**ORDER**</u>

Before the Court is *pro se* Plaintiff Anthony Lamar's Motion for a Preliminary Injunction.

For the reasons stated below, the Motion is GRANTED.

**I. BACKGROUND**[1]

In early 2020, the COVID-19 virus hit the United States and the world's largest economy

basically ground to a halt. States, some more forcefully than others, told people to stay at home.

Entire office buildings were emptied as thousands of businesses shifted to remote work. Schools

moved online. Unemployment skyrocketed.

Congress acted quickly. On March 27, 2020, Congress passed the Coronavirus Aid, Relief,

and Economic Security (CARES) Act.[2] Barely one week after the first state-issued "stay-at-home

order" in the country, the federal government pumped $2 trillion into the national economy.[3] At

least for purposes of this case, the most notable piece of the CARES Act was a $1,200 payment to

---

[1] There are many cases that have been brought in this Court by prisoners regarding Act 1110. The legal claims in the cases substantially overlap. The facts of each claim vary slightly. The Court has consolidated the cases in a master docket, *Hayes v. Rutledge*, 4:21-CV-00347-LPR, and has chosen three cases to advance as test cases. Those three cases are the instant one, *Hayes*, and *Holloway v. Ark. Gen. Assembly*, 4:21-CV-00495-LPR. The Court takes judicial notice of the filings in all the consolidated cases. *See* Fed. R. Evid. 201. The Court may refer to filings in some of the other consolidated cases in the instant Order.

[2] Pub. L. 116-136, 134 Stat. 281 (2020).

[3] Amanda Moreland, et al., *Timing of State and Territorial COVID-19 Stay-at-Home Orders and Changes in Population Movement — United States, March 1 – May 31, 2020*, Centers for Disease Control and Prevention (Sept. 4, 2020) (California's March 19, 2020 stay-at-home order was the first in the nation), https://tinyurl.com/8strpje5.

every American adult with an income below $75,000.[4]  These payments, commonly known as "stimulus checks," were rapidly distributed so they could have an immediate impact.  For those who did not get their payment immediately, the $1,200 would be credited to their following tax bill.  Over the next year, Congress passed two more "stimulus" or "relief" bills.  The second relief package, part of the December 27, 2020 Consolidated Appropriations Act (CAA), included a $600 stimulus payment or tax credit.[5]  The third, and most recent, round of stimulus payments came on March 11, 2021 under the American Rescue Plan Act (ARPA) and paid out a $1,400 stimulus or tax credit.[6]

Congress made only very narrow exceptions to who qualified to receive such funds. Prisoners fell under the definition of eligible individuals entitled to receive all three stimulus payments.  This policy did not sit well with some people.  The Internal Revenue Service (IRS) originally declined to send stimulus payments to incarcerated individuals.  The IRS relented in late 2020, after a federal district court entered a permanent injunction requiring the stimulus payments to be distributed to prisoners.[7]  Inmates of the Arkansas Department of Corrections (ADC) system thus began to receive their stimulus payments.

Believing this money could be put to better use, the Arkansas General Assembly passed Arkansas Act 1110.[8]  Act 1110 instructs ADC officials to withhold any stimulus checks paid to inmates and instead use the funds in one of two ways.  First, the funds must be used to pay off a prisoner's court fines, fees, costs, or restitution if the ADC is aware of such debts.[9]  If a prisoner

---

[4] 26 U.S.C. § 6428(d); Pub. L. 116-136, § 2201(a), 134 Stat. 281, 335 (2020).

[5] 26 U.S.C. § 6428A; Pub. L. 116-260, § 272, 134 Stat. 1182, 1965 (2020).

[6] 26 U.S.C. § 6428B; Pub. L. 117-2, § 9601, 135 Stat. 4, 138 (2021).

[7] *Scholl v. Mnuchin*, 494 F.Supp.3d 661, 692-93 (N.D. Cal. 2020).

[8] Ark. Code Ann. § 12-29-119 (2021).

[9] *Id.*

does not owe any such debts, or if the ADC officials are not made aware of any these debts, or if there is money left over after paying the debts of which the ADC officials are made aware, the funds must be distributed in equal parts to an "inmate welfare fund" and the Division of Correction Inmate Care and Custody Fund Account.[10]

There is one quirk to this law worth mentioning up front. By its own terms, the dictates of the law only apply to the extent they are not prohibited by federal law.[11]  It appears that ADC officials have taken the position that their current collection of stimulus funds does not run afoul of federal law and is thus fully authorized by the statute. Accordingly, under Act 1110 as it is currently being implemented by ADC officials, prisoners do not keep any stimulus money sent to them by the United States.

The mechanics of this process are important. Any time an inmate receives a check— stimulus or otherwise—an ADC official brings it to the inmate for endorsement.[12]  The check is then deposited into one large account, and records of how much each inmate has available to spend are kept in an "inmate checking account."[13]  ADC officials follow a similar procedure when the stimulus checks arrive, but instead of being deposited into the centralized account the stimulus

---

[10] Ark. Code Ann. § 12-29-119 (2021). Act 1110 does not expressly say what happens to money left over after paying court fines, fees, costs, or restitution. The statute says what must happen if an inmate has such existing debts: the stimulus funds must first be used to pay them off before the inmate may use the funds "for any other purpose." § 12-29-119(a). The statute also says what should happen in the case where an inmate has no known debts: ADC officials should divert the funds to the inmate welfare fund and the Inmate Care and Custody Fund Account when an inmate "has no known existing court fines, fees, costs, or restitution." § 12-29-119(d). However, there is a third scenario that the statute does not explicitly discuss: when there are known debts, those debts are paid off, and some portion of the federal stimulus funds remain. The ADC officials have taken the position that, under the statute, any such leftover money also goes to the inmate welfare fund and the Inmate Care and Custody Fund Account. *See* 4:21-CV-00347, Def.'s Consolidated Br. in Opp'n to Mot. for Temporary Restraining Order and Preliminary Injunction and in Supp. of Mot. to Dismiss (Doc. 16) at 5 [*hereinafter Master Case Docket*]. Because Mr. Lamar's claims, other than his preemption claim, are based on ADC officials' actions under Act 1110 rather than Act 1110 itself, this discrepancy is largely immaterial.

[11] *See* Ark. Code Ann. § 12-29-119(a).

[12] *Master Case Docket*, Ex. 1 to Def.'s Consolidated Br. in Opp'n to Mot. for Temporary Restraining Order and Preliminary Injunction and in Supp. of Mot. to Dismiss (Declaration of Jeffrey Jerry) (Doc. 16-1) ¶ 7.

[13] *Id*. ¶ 4.

funds have been "sequestered into a fiduciary banking account" for the time being.[14]  We are not talking about a small amount of money.  So far, the ADC has deposited $3,503,095.56—with more on the way.[15]  From this more than three and a half million dollars, the ADC has paid a total of $461,630.32 towards existing court fines, fees, costs, or restitution.  The ADC has been clear that they do not intend to begin distributing the remaining stimulus monies to the inmate welfare fund or the Inmate Care and Custody Fund Account "until sometime in early 2022."[16]

Plaintiff Anthony Lamar is a prisoner within the ADC prison system.  He is anticipating the arrival of $1,200 under the CARES Act and $600 under the CAA.[17]  Understandably, he seeks to prevent the ADC officials from confiscating those checks once they arrive.  On August 5, 2021, Mr. Lamar filed his Amended Petition for Declaratory Judgment and Complaint for Separate Relief.[18]  On August 19, 2021, Mr. Lamar moved for a temporary restraining order (TRO) as well as a preliminary injunction seeking to prevent the ADC officials from enforcing Act 1110.  The Court denied the TRO but allowed the Motion for Preliminary Injunction to move forward.  The ADC officials have responded, and a hearing has been held.

---

[14] *Master Case Docket*, Declaration of Jeffrey Jerry (Doc. 74) at 2.

[15] *Id.*

[16] *Id.* at 3.

[17] *Lamar Case Docket*, Pl.'s Am. Pet. For Declaratory Judgement and Compl. for Separate Relief (Doc. 11) at 9.  Mr. Lamar has already received his $1,400 payment under ARPA.  Pursuant to ADC Administrative Directive (AD) 16-44, $1,395 of that payment was confiscated to pay off Mr. Lamar's inmate liens.  Mr. Lamar has challenged the constitutionality of AD 16-44, but that is not one of the claims on which he is seeking a preliminary injunction.  *See id.* at 10-14.  There are a fair number of inmates with cases on the consolidated docket (and who have filed motions for preliminary injunction) who have received stimulus money under one or more of the federal acts discussed above.  Those funds have been sequestered.  *See Master Case Docket*, Declaration of Jeffrey Jerry (Doc. 74) at 3-5.

[18] *Lamar Case Docket*, Pl.'s Am. Pet. For Declaratory Judgement and Compl. for Separate Relief (Doc. 11).

4

## II. DISCUSSION

A preliminary injunction is "an extraordinary remedy."[19]  Generally, deciding a motion for preliminary injunction requires the district court to balance the four *Dataphase* factors: "(1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other party; and (4) the public interest."[20]

There are some caveats or tweaks to this general test that are potentially relevant to the case at bar.  When a movant seeks to enjoin a statute (or related government action), the first factor is not established unless the movant shows he is more likely than not to prevail on the merits.[21]  When a movant seeks to enjoin governmental action, the last two factors merge.[22]  When "granting [a] preliminary injunction will give plaintiff substantially all the relief [he] would obtain after a trial on the merits," "[t]he burden of demonstrating that a preliminary injunction is warranted is a heavy one . . . ."[23]  Finally, addressing a request by an inmate to enjoin the actions of prison officials demands "great caution because 'judicial restraint is especially called for in dealing with the complex and intractable problems of prison administration.'"[24]  A federal court should not interfere with a state prison's administration "unless either a constitutional violation has already occurred or the threat of such a violation is both real and immediate."[25]

---

[19] *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

[20] *Id.* (citing *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981)).

[21] *Planned Parenthood v. Rounds*, 530 F.3d 724, 732-33 (8th Cir. 2008).  This burden is a step above the "familiar 'fair chance of prevailing' test where a preliminary injunction is sought to enjoin something other than government action based on presumptively reasoned democratic processes."  *Id.* at 732.

[22] *Nken v. Holder*, 556 U.S. 418, 435 (2009).

[23] *Dakota Indus., Inc. v. Ever Best Ltd.*, 944 F.2d 438, 440 (8th Cir. 1991).

[24] *Goff v. Harper*, 60 F.3d 518, 520 (8th Cir. 1995) (quoting *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982)).

[25] *Id.* at 521 (quoting *Rogers*, 676 F.2d at 1214).

## A. LIKELIHOOD OF SUCCESS ON THE MERITS

Mr. Lamar claims he is entitled to a preliminary injunction because Act 1110 is invalid under the Supremacy Clause and because confiscation of his stimulus checks will violate the CARES Act and the CAA, the Due Process Clause, and the Takings Clause.[26]  The Court addresses the likelihood of success on each claim in turn.

### 1. Preemption and Statutory Claims[27]

Mr. Lamar asserts that Act 1110 is invalid because it is preempted by the CARES Act and the CAA.  Relatedly, he claims that the ADC officials will violate those federal acts when they confiscate the incoming payments.

### A. No Private Right of Action

Because Mr. Lamar seeks relief under 42 U.S.C. § 1983, he must "allege the violation of a right secured by the Constitution and laws of the United States."[28]  The Supremacy Clause, however, "is not the source of any federal rights."[29]  Unless the stimulus acts provide a cause of action that enables Mr. Lamar to enforce those statutes, this Court is without jurisdiction to adjudicate any preemption claim.  Likewise, if those federal statutes do not provide a cause of

---

[26] *Lamar Case Docket*, Pl.'s Mot. for Temporary Restraining Order, or Alternatively, for Preliminary Injunction (Doc. 17) at 8-11.  Mr. Lamar's Motion says the confiscation would be a direct violation of the CAA and the ARPA.  *See id.* at 8-9.  Because he has already received his ARPA check and had it deducted from his account pursuant to an unrelated ADC policy, the Court believes he meant the CARES Act and the CAA.  Those are the two payments he is still anticipating.  *See id.* at 9-12; *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 849 (8th Cir. 2014) (*Pro se* complaints are to be construed liberally.).

[27] The analysis in this section discusses only the CARES Act and the CAA, but it applies equally to the third federal stimulus and relief bill, ARPA.  As explained *supra* note 17, plaintiffs in the consolidated cases have received or are soon to receive stimulus monies under all three acts.

[28] *West v. Atkins*, 487 U.S. 42, 48 (1988).  *See also Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 324-27 (2015) (rejecting a lower court's holding that there is "an implied right of action under the Supremacy Clause to seek injunctive relief against the enforcement or implementation of state legislation"); *St. Louis Effort for AIDS v. Lindley-Myers*, 877 F.3d 1069, 1071 (8th Cir. 2017) (42 U.S.C. § 1983 "does not provide a remedy for Supremacy Clause violations").

[29] *Armstrong.*, 575 U.S. at 324-25.

action, this Court cannot enjoin ADC officials from confiscating the payments on the basis that their actions violate those statutes.

The Supreme Court has declared an end to the era of federal courts freely creating private rights of action to enforce statutes when no such right exists in the text.[30]  A private cause of action does not arise simply because it is "desirable . . . as a policy matter," or even because it seems like the logical way to carry out a statute's purpose.[31]  The question is not only whether a private right has been created, but whether Congress created a private *remedy*.[32]  "Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress."[33]  In the Eighth Circuit, *Does v. Gillespie* sets the post-*Armstrong* standard for determining whether Congress created a private right of action.[34]  Under that standard, none of the federal acts at issue create the necessary private right of action.

The relevant portion of the CARES Act, codified at 26 U.S.C. § 6428, operates almost entirely as a directive to a federal agency.[35]  While the first subsection does entitle every "eligible individual" to a sum of money in the form of a tax credit,[36]  the rest of the statute relates to the procedures required to administer the payments.[37]  Moreover, there are already remedial schemes to vindicate interests created by this Act.  For example, if a plaintiff wanted to contest whether the

---

[30] *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S.Ct. 1009, 1015 (2020); *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1855-56 (2017); *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001).

[31] *Sandoval*, 532 U.S. at 286.

[32] *Id.*

[33] *Comcast Corp.*, 140 S.Ct. at 1015 (quoting *Sandoval*, 532 U.S. at 286-87).

[34] 867 F.3d 1034, 1039-43 (8th Cir. 2017).

[35] *See Osher v. City of St. Louis*, 903 F.3d 698, 703 (8th Cir. 2018) (A statute did not create "individually enforceable rights" when the statute was phrased "as a directive to the regulated agency" and Congress had also provided for "an administrative mechanism to enforce compliance with the Act.").

[36] 26 U.S.C. § 6428(a).

[37] Notably, 26 U.S.C. § 6824 falls under Subtitle F, which is dedicated to "Procedure and Administration."

federal government properly calculated and disbursed a tax credit or refund under the statute, this would not take the form of a lawsuit to enforce the CARES Act itself.  Instead, it would fall under the IRS's internal claims procedures and then, if necessary, a suit for a refund under the cause of action provided by 26 U.S.C. § 7422.[38]  For another example, consider *Scholl v. Mnuchin*.  Even when the district court in *Scholl* enjoined the IRS from refusing refunds to individuals solely based on their incarceration status, relief did not flow directly from the CARES Act.  Instead, it flowed from a cause of action in the Administrative Procedure Act.[39]  Sometimes, the existence of other "remedial schemes foreclose a private cause of action to enforce even those statutes that admittedly create substantive private rights."[40]

The best argument for the existence of a private cause of action comes from an uncodified administrative amendment to the CARES Act which provided some limited protections (detailed in the accompanying footnote) to the payments created by the CARES Act.[41]  Even if these protections did apply to Mr. Lamar's incoming payments, they do not "unambiguously create[] an

---

[38] 26 U.S.C. § 7422 (governing "Civil Actions for Refunds," which may be maintained only after filing a claim for a credit or refund).

[39] *Scholl*, 494 F.Supp.3d at 692 ("IRS's decision to exclude incarcerated individuals from receiving [stimulus checks] solely on the basis of their status as incarcerated individuals violated the APA.").  The plaintiffs in *Scholl* brought their lawsuit under causes of action in the Administrative Procedure Act and under a cause of action in the Little Tucker Act.  *Id.* at 669-70.

[40] *Sandoval*, 532 U.S. at 290 (citing *Middlesex Cnty. Sewerage Authority v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 19-20 (1981)).  *See also Osher*, 903 F.3d at 703 (finding no private right of action when Congress had also provided for "an administrative mechanism to enforce compliance with the Act").

[41] Pub. L. 116-136, § 2201(d), 134 Stat. 281, 338 (2020).  These protections only applied to actions taken by the IRS *before* the refunds are issued.  For example, sometimes people owe federal tax debts, state income tax debts, and certain nontax debts to a state government.  When these governmental bodies have a hard time getting their money from that person, they will submit a claim to the IRS asking that money be withheld from that person's tax refund.  So, if a person owed the State of Arkansas $100, and that person was expecting a $1,000 tax refund, the State of Arkansas could ask the IRS to take $100 and give it to the State, and the person would only receive a check for $900.  This process is known as a "reduction" or "offset."  The CARES Act stated the payments it created could not be reduced or offset by this process.  Importantly, the protection only applied to the "advance refund and credits."  Pub. L. 116-260, § 273(b), 134 Stat. 1182, 1978 (2020) (retroactively amending the CARES Act).  By law, no more advance refunds and credits (under the CARES Act) were issued after December 31, 2020.  26 U.S.C. § 6428(f)(3)(A).  Accordingly, the narrow protections for advance refunds and credits do not apply to Mr. Lamar's anticipated payment under the CARES Act.

enforceable federal right,"[42] and the actions by the ADC officials do not violate them.  Thus, the CARES Act does not provide a private cause of action on which a preemption or statutory violation argument may be made.

The CAA, codified at 26 U.S.C. § 6428A, has essentially the same operative language as the CARES Act.  The one notable difference is an additional layer of protections in the CAA applicable to refunds *after* they are issued.  An uncodified administrative amendment to § 6428A reads: "[t]he right of any person to any applicable payment shall not be transferable or assignable, at law or in equity, and no applicable payment shall be subject to, execution, levy, attachment, garnishment, or other legal process, or the operation of any bankruptcy or insolvency law."[43]  Still, this language alone does not "unambiguously create[] an enforceable federal right."[44]  For one, "applicable payment" only pertains to advance refunds and credits.[45]  Under the CAA, any payments issued after January 15, 2021 are not advance refunds.[46]  So, Mr. Lamar's incoming payment does not fall within the scope of the protection.  Moreover, this provision is likely only relevant as a defense to an action someone else would bring against the individual receiving the refund.[47]

In sum, Mr. Lamar is not likely to succeed on the merits of his claims that Act 1110 is preempted by the stimulus acts or his claims that ADC officials will violate those acts when they

---

[42] *Gillespie*, 867 F.3d at 1041.

[43] Pub. L. 116-260 § 272(d)(2)(A), 134 Stat. 1182, 1972 (2020).

[44] *Gillespie*, 867 F.3d at 1041.

[45] Pub. L. 116-260, § 272(d)(2)(E)(iii)(I).

[46] 26 U.S.C. § 6428A(f)(3)(A)(ii)(I).

[47] The foregoing analysis applies equally to the third federal stimulus and relief bill, ARPA.  Thus, ARPA likewise does not create a private cause of action.

confiscate his incoming payments.  To succeed on either of these claims, the stimulus acts would have to provide Mr. Lamar with a private cause of action.  They do not.

B.    *No Obsctacle Preemption*

Let's assume *arguendo* that the federal statutes at issue here created private rights of action (they do not).  At first glance, Mr. Lamar's preemption claim would appear to have a high likelihood of success.  But for reasons explained below, first glances can be deceiving.

The Supremacy Clause renders state law void to the extent that it conflicts with federal law.[48]  Preemption of state law can occur multiple ways, two of which are relevant to Mr. Lamar's claims.[49]  First, federal law will preempt state law when the two directly conflict.  In other words, if it is impossible to comply with both, the state law must fall.[50]  Second, a state law will be invalidated if it poses an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[51]  There is no conflict preemption in this case because neither Act 1110, nor any action taken under it, directly violates any relevant provision of the CARES Act or the CAA.  Mr. Lamar's preemption claims therefore rest on the doctrine of obstacle preemption.

If Act 1110 authorizes ADC officials to confiscate prisoners' federal stimulus funds and disburse any portion of those funds to the inmate welfare fund and the Inmate Care and Custody Fund Account, it would stand as an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[52]  Whether one defines Congress's purposes and objectives

---

[48] *Hillman v. Maretta*, 569 U.S. 483, 490 (2013).

[49] One form of preemption is express preemption.  Express preemption occurs when Congress's intent to invalidate state law is "explicitly stated in the statute's language."  *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992).  The federal stimulus acts do not contain such language, so express preemption is not relevant to these cases.

[50] *Mutual Pharmaceutical Co. v. Bartlett*, 570 U.S. 472, 480 (2013).

[51] *Wyeth v. Levine*, 555 U.S. 555, 563 (2009) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).  The Court's faithful application of obstacle preemption in this case should not be confused with an endorsement of that doctrine.  The constitutional propriety of obstacle preemption is above my pay grade.  *See infra* note 58.

[52] *Wyeth v. Levine*, 555 U.S. 555, 563 (2009) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

in the CARES Act and the CAA in broad terms of economic stimulation or narrow terms of simply giving people "free" money,[53] Act 1110 plainly frustrates the method which Congress chose to achieve its purpose.[54] As to these monies, it is difficult to imagine a larger obstacle to the execution of Congress's purpose than taking away people's money that Congress gave them. There is no relevant distinction to be drawn between such a confiscation and the legislature requiring all Arkansas citizens to turn over the stimulus funds they received to their local government for community projects.

The ADC officials argue that Congress's purpose was economic stimulation and that the use of these monies by the ADC (as opposed to by the prisoners) actually advances (or at least does not stand as an obstacle to) economic stimulation. They contend that the prisoners' use of the money would not stimulate the economy, but the ADC's use of the money would. Also implied in their argument is the contention that, to the extent Congress's objective was to make sure people didn't go without necessities during hard times, that concern does not apply to prisoners. The ADC's arguments miss the mark. Confiscation of the money is an obstacle to Congress's choice. Even if one genuinely believes Act 1110 is the better way to serve Congress's purpose, neither the State of Arkansas nor this Court is in any position to second guess Congress's chosen method. Congress gave money to everyone.[55]

---

[53] *See* Milton Friedman, *There's No Such Thing as a Free Lunch* (1977).

[54] *Arizona v. United States*, 567 U.S. 387, 406 (2012) ("[C]onflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy." (quoting *Motor Coach Emps. v. Lockridge*, 403 U.S. 274, 287 (1971)); *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987) ("A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach this goal.").

[55] The foregoing analysis is limited to the monies left over after the payment of court fines, fees, costs, or restitution. Where Act 1110 operates to pay off an inmate's debts, the inmate directly and fully receives the benefit of that money. This is not an obstacle to Congress's plan to give money to people. Inmates may lose out on the ability to decide how every penny of the stimulus money is spent, but inmates do not have an absolute right to complete control over their money when they are incarcerated and owe financial obligations related to their incarceration. *See Mahers v. Halford*, 76 F.3d 951, 955 (8th Cir. 1996) (Criminal restitution created a debt that deprives an inmate "of complete freedom over how to spend future money until this debt was satisfied.").

But there's a problem for Mr. Lamar and it's a doozy. Act 1110 specifically states that its provisions only apply "unless prohibited by federal law."[56] What is the ordinary meaning of the phrase "prohibited by federal law" as it is used in this statute?[57] The parties appear to believe its meaning is limited to express preemption by a federal statute. But their suggestion is grounded less in the text and more in divining the intent of the General Assembly. This is not how we interpret statutes these days. We focus on the words. "Federal law" includes more than just federal statutes. Would anyone think "prohibited by federal law" excludes something prohibited by the Constitution? No. Would anyone think "prohibited by federal law" excludes something prohibited by federal common law in the very confined areas in which it still exists? No. If the General Assembly meant prohibited by federal statutes, they could have said prohibited by federal statutes. But they said prohibited by federal law. An ordinary person of common intelligence would read the words "federal law" to include doctrines like obstacle preemption.[58]

A state statute that renders its provisions inapplicable where they would otherwise be preempted essentially saves itself from formal preemption. It is true that, given this analysis, ADC officials are acting in excess of their state law authority when they take any more of a prisoner's stimulus money than necessary to pay off court fines, fees, costs, or restitution. However, this court has no power to enjoin state officials' actions based solely on violations of state law.[59]

---

[56] Ark. Code Ann. § 12-29-119(a).

[57] *Niz-Chavez v. Garland*, 141 S.Ct. 1474, 1480 (2021) ("[T]his Court normally seeks to afford the law's terms their ordinary meaning at the time Congress adopted them.").

[58] The Court is aware that there are a limited number of "ordinary" people who would even be aware of the obstacle preemption doctrine, especially given that many extraordinary legal minds believe the doctrine should not exist at all. *E.g.*, *Wyeth*, 555 U.S. at 604 (Thomas, J., concurring in the judgment) (stating that obstacle preemption "facilitates freewheeling, extratextual, and broad evaluations of the 'purposes and objectives' embodied within federal law"); *Virginia Uranium v. Warren*, 139 S.Ct. 1894, 1901 (2019) (lead opinion of Gorsuch, J.) ("Invoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law.").

[59] *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 124-25 (1984) ("We hold that these federal courts lacked jurisdiction to enjoin petitioner state institutions and state officials on the basis of this state law."). The obstacle preemption doctrine has not been expanded so far as to preempt the actions of state officials absent some official state

### 2.  Procedural Due Process

Mr. Lamar alleges that Act 1110 and the ADC officials' confiscation of stimulus funds violate the Fourteenth Amendment's guarantee that no State may "deprive any person of life, liberty, or property, without due process of law."[60]  For purposes of the Due Process Clause, property interests "are created and their dimensions defined by existing rules or understandings that stem from an independent source such as state law."[61]  Arkansas law and common sense recognize that prisoners have a property interest in money.[62]  But it is also true that common sense and Supreme Court precedent recognize "that the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large."[63]

Mr. Lamar has no shot at success with respect to the monies used to pay off court fines, fees, costs, or restitution.  The Eighth Circuit has definitively spoken in *Mahers v. Halford* on "what process is due before money received from outside sources can be applied toward an inmate's restitution obligations."[64]  In that case, the "deduction from funds received from outside sources applied to satisfy an inmate's restitution obligations . . . did not violate the Due Process Clause."[65]  The *Mahers* Court noted that by the time the funds were deducted from the inmates' accounts, the prisoners had been afforded "a full trial or plea hearing and an opportunity to be heard on claims of a lack of ability to pay restitution."[66]  Once the restitution plan had been

---

agency policy or executive pronouncement.  *See* Chang Derek Liu, *The Blank Page Before You: Should the Preemption Doctrine Apply to Unwritten Practices?*, 109 Colum. L. Rev. 350 (2009).

[60] U.S. Const. am. XIV.

[61] *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 749 (2005).

[62] *See* Ark. Code Ann. § 12-29-108 (2019) (requiring a hearing before confiscation of a prisoner's cash above a certain amount); *see also Murray v. Dosal*, 150 F.3d 814, 818-19 (8th Cir. 1998).

[63] *Shaw v. Murphy*, 532 U.S. 223, 229 (2001).

[64] 76 F.3d 951 (8th Cir. 1996).

[65] *Id.* at 956.

[66] *Id.* at 955.

established, "a debt was created and the inmate was deprived of complete freedom over how to spend future money until this debt was satisfied."[67]  Mr. Lamar was convicted after a trial or plea hearing, and Arkansas state law requires considering a convict's ability to pay when setting a restitution amount.[68]

*Mahers* is authoritative as to restitution and highly persuasive as to court fines, fees, and costs.  Act 1110 was passed by both houses of the Arkansas General Assembly and signed into law by the governor.  Restitution, fines, fees, and costs are set by the Court.  To the extent that ADC officials divert Mr. Lamar's stimulus funds to pay his existing court fines, fees, costs, or restitution, *Mahers* shows that this is all the process that is due.

Mr. Lamar's chances are much better with respect to the monies left over after any court fines, fees, costs, or restitution.  In fact, he is likely to succeed on this part of his claim.  *Mahers* does not control.  The decision in *Mahers* was partially a result of "the limited nature of the deprivation" that was involved in that case.[69]  Moreover, the *Mahers* Court specifically noted that the prisoners' complete deprivation of control over their money only lasted *until* their restitution debts were satisfied.[70]  The case at bar is not similarly limited.

The ADC officials do not only deprive prisoners of the stimulus funds necessary to pay off court fines, fees, costs, or restitution, but also redirect any remaining amount to an "inmate welfare fund" the Inmate Care and Custody Fund Account.[71]  Moreover, Act 1110 requires ADC officials to engage in individualized fact-finding.  An ADC official must "[v]erify the funds

---

[67] *Id.*

[68] *See* Ark. Code Ann. § 5-4-205(e)(2)(B).

[69] 76 F.3d at 956.

[70] *Id.* at 955.

[71] Ark. Code Ann. § 12-19-119(d)(1)-(2).

received by the person are intended for the person."[72]   The official must "[v]erify the funds received are federal relief or stimulus funds."[73]   When applicable, the official must accurately subtract any outstanding fines, fees, or restitution and forward it to the appropriate county or city treasurer.[74]  And the ADC official must ensure his conduct is not prohibited by federal law, because if it is the state statute by its own terms does not authorize his conduct.

Mr. Lamar alleges that enforcement of Act 1110, without a pre-deprivation hearing, violates the Due Process Clause.  But "the judicial model of an evidentiary hearing is neither a required, nor even the most effective, method of decision-making in all circumstances."[75]  Instead, "due process is flexible and calls for such procedural protections as the particular situation demands."[76]   To answer the question of "what process is due" to deprive the prisoners of their excess stimulus funds, this Court must balance several factors:

> First, the private interest that will be affected by the official action; Second, the Government interest; and third the risk of an erroneous deprivation of [the private] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards.  The ultimate balance involves a determination as to when, under our constitutional system, judicial-type procedures must be imposed upon administrative action to assure fairness.[77]

The Court is not writing on an entirely clean slate when it comes to applying the *Mathews* test to an established state procedure depriving someone of property. [78]   Two Eighth Circuit cases,

---

[72] Ark. Code Ann. § 12-19-119(b)(1).

[73] Ark. Code Ann. § 12-19-119(b)(2).

[74] Ark. Code Ann. § 12-19-119(b)(3)-(4).

[75] *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976).

[76] *Id.* at 334 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).

[77] *Mickelson v. Cnty. of Ramsey*, 823 F.3d 918, 923-24 (8th Cir. 2016) (internal quotations omitted), *cert denied* 137 S.Ct. 1578 (2017).

[78] *See Walters v. Wolf*, 660 F.3d 307, 313-14 (8th Cir. 2011); *see also Coleman v. Watt*, 40 F.3d 255, 262 (8th Cir. 1994) ("[T]he availability of state law postdeprivation remedies bears relevance only where the challenged acts of state officials can be characterized as random and unauthorized.").

*Walters v. Wolf*[79] and *Mickelson v. County of Ramsey*[80] tee up the dilemma the Court faces under *Mathews*.

In *Walters*, the Eighth Circuit noted that "when an established state procedure deprives one of property, postdeprivation remedies generally fail to satisfy *Mathews*."[81]  The *Walters* Court emphasized that this "especially holds true when the proffered postdeprivation remedy is a subsequent tort suit."[82]  The *Walters* Court went on to hold that a "post-hoc state tort action to address the deprivation [was] inherently insufficient" to satisfy due process when police officers refused to return seized firearms after dropping all related criminal charges.[83]

Subsequently, in *Mickelson*, the Eighth Circuit walked back (or, perhaps put more politely, heavily cabined) the *Walters* holding.[84]  In *Mickelson*, the Eighth Circuit upheld a state statute authorizing the immediate collection of a $25 booking fee from the cash of anyone booked into a detention facility.[85]  Characterizing *Walters* as "turn[ing] on the 'lengthy and speculative' nature of the postdeprivation remedy available—an action in tort," the Eighth Circuit concluded that *Walters* did not really mean to "foreclose the possibility that an adequate postdeprivation process may satisfy" due process.[86]

---

[79] 660 F.3d 307 (8th Cir. 2011).

[80] 823 F.3d 918 (8th Cir. 2016), *cert denied*, 137 S.Ct. 1578 (Mem), 197 L.E.2d 735 (2017).

[81] *Walters*, 660 F.3d at 313.

[82] *Id.* (quoting *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436-37 (2011)) (emphasis in original).

[83] *Id.* at 314-15.

[84] It's not for a humble District Court judge to say whether *Mickelson*'s creative reading of *Walters* was consistent or inconsistent with the rule concerning how panels are bound by decisions of a previous panel.  *See Brown v. First Nat'l Bank in Lenox*, 844 F.2d 580, 582 (8th Cir. 1988) ("[O]ne panel of this Court is not at liberty to overrule an opinion filed by another panel.  Only the Court en banc may take such a step.").

[85] *Mickelson*, 823 F.3d at 921.

[86] *Id.* at 928 (quoting *Walters*, 660 F.3d at 313-14).

16

*Mickelson* distinguished *Walters* based on the availability of *efficient* internal procedures in that case that allowed refunds for improperly held money.[87]  If the detainee was immediately released, not charged for a crime, had the charges dismissed, or was acquitted, then the detention facility would return the booking fee after the detainee filled out a refund request form.[88]  The *Mickelson* Court also specifically acknowledged the existence of an internal grievance process as a factor weighing in favor of due process in that case.[89]  Importantly for the case at bar, *Mickelson* did "note that it is conceivable that future plaintiffs could claim . . . that the county must change or improve its postdeprivation procedure in order to comply with the due process requirement that the remedy be adequate."[90]

With *Walters* and *Mickelson* in mind, the Court turns to the *Mathews* test.   Mr. Lamar's private interests in these excess stimulus funds are quite substantial. There are hundreds to thousands of dollars at stake for each affected inmate.  It is fair to say that the nature of the penal system inevitably places "restrictions and limitations" on Mr. Lamar's rights and privileges.[91]  But while his private interest in the excess stimulus funds is perhaps less pronounced than it is for a member of society at large, his interest is still real and serious.  Certainly, his interest is far greater than the $25 booking fee in *Mickelson*.

On the other side of the ledger, the State's interest in the excess funds is also substantial. The ADC gets an influx of funds to its Inmate Care and Custody Fund Account and inmate welfare

---

[87] *Id.* at 929.

[88] *Id.* at 921-22.

[89] *Id.* at 926, 929-30. *Mickelson* did not have occasion to pass on the adequacy of the internal grievance process because it was not an issue on appeal.  *Id.* at 930.

[90] *Id.* at 929.

[91] *Mahers*, 76 F.3d at 954 (quoting *Bell v. Wolfish*, 441 U.S. 520, 545 (1979)).

fund, allowing it to "conserve scarce resources" and "maintain cost-effective procedures."[92]   In addition to its general interest, the State has a specific interest in securing the funds at the outset because, otherwise, an inmate could spend the funds before the State has a chance to divert them.

The final factor is the risk of erroneous deprivation and probable value of additional or substitute procedural safeguards.  Given *Walters* and *Mickelson*, it's unlikely that a pre-deprivation opportunity to be heard is constitutionally necessary.  However, it is likely that an efficient, meaningful post-deprivation opportunity to be heard is constitutionally necessary.  And this excludes a tort suit or any similarly lengthy and speculative process—such as a claim to the Arkansas Claims Commission.[93]

Many federal circuit courts faced with similar facts have found that internal grievance procedures afford an adequate post-deprivation remedy.[94]  The Court agrees.  In the case at bar, if the grievance process allows for a quick and efficient form of relief, the constitutionally required due process has been provided.  Determining the adequacy of the grievance process requires considering exactly what Mr. Lamar could contest, and whether the grievance process would afford relief if he turned out to be right.

Act 1110 only authorizes ADC officials to confiscate "federal relief or stimulus funds."[95] All parties agree that Mr. Lamar must be able to contest whether funds taken by ADC officials actually fall within that definition.  The ADC's grievance policy is not entirely clear as to whether funds would be returned if an inmate proved they were not federal relief or stimulus funds.  This

---

[92] *Mickelson*, 823 F.3d at 925 (quoting *Broussard v. Parish of Orleans*, 918 F.3d 644, 656-57 (5th Cir. 2003)).

[93] *Mathews*, 424 U.S. at 331 ("A claim to a predeprivation hearing as a matter of constitutional right rests on the proposition that full relief cannot be obtained at a postdeprivation hearing.")

[94] *See Mickelson*, 823 F.3d at 926 (collecting cases).

[95] Ark. Code Ann. § 12-29-119(b)(2).

is because the policy states that monetary damages are not an available remedy.[96]  However, the ADC has provided a Declaration to make clear that recouping of funds erroneously taken, including the potential recouping of the funds at issue, "does not fall within the provision of [the grievance policy] that bars monetary damages."[97]  So far, so good.

But there's a problem for the ADC officials that is not mitigated by the Declaration. Because Act 1110 by its own terms does not authorize the ADC officials to take any stimulus funds when doing so would be prohibited by federal law, a constitutionally adequate opportunity to be heard must include an ability to contest whether confiscation of the stimulus payments is "prohibited by federal law."  The ADC grievance policy states that "[m]atters beyond the control of the Division of Correction, including issues controlled by State or Federal law or regulation" are "non-grievable issues."[98]  At the Motion hearing, the Court specifically asked for clarification as to whether an inmate could challenge a confiscation as violating federal law under the grievance policy.  The Declaration supplied to the Court dances around the issue but does not confront it directly.  This silence speaks volumes.  The Court therefore concludes that it is more likely than not that the grievance process cannot be successfully used to show the confiscation was prohibited by federal law.  This makes it more likely than not that the grievance process is constitutionally insufficient, and in turn more likely than not that Mr. Lamar will succeed on the merits of his procedural due process claim.[99]

---

[96] *Master Case Docket*, Ex. 3 to Def.'s Consolidated Br. in Opp'n to Mot. for Temporary Restraining Order and Preliminary Injunction and in Supp. of Mot. to Dismiss (Affidavit of Terri Grigsby-Brown) (Doc. 16-3) at 5.

[97] *Master Case Docket*, Declaration of Jeffrey Jerry (Doc. 74) at 2.

[98] *Master Case Docket*, Ex. 3 to Def.'s Consolidated Br. in Opp'n to Mot. for Temporary Restraining Order and Preliminary Injunction and in Supp. of Mot. to Dismiss (Affidavit of Terri Grigsby-Brown) (Doc. 16-3) at 5.

[99] The Court recognizes this may have serious practical consequences on the enforcement of Act 1110 in Arkansas prisons.  But the statute is what it is.  This Court cannot simply read out the phrase "unless prohibited by federal law" merely because it has undesirable and unanticipated consequences.  The Arkansas General Assembly conditioned the applicability of this statute on a finding that taking prisoners' money would not violate federal law.  The Due Process clause requires some meaningful and efficient opportunity for a prisoner to prove that taking his money is prohibited

### 3. Substantive Due Process

State law will survive a substantive due process challenge so long as it does not restrict a fundamental right and is rationally related to a legitimate state interest.[100]  Diverting the prisoners' federal relief and stimulus funds is rationally related to the State's legitimate interests in collecting court fines, fees, and costs, providing victims of crimes with restitution, maintaining the statutorily mandated inmate welfare fund, and helping pay for other costs associated with housing inmates.[101] So, unless Act 1110 restricts a fundamental right, it does not violate the controlling substantive due process doctrine.

A right is fundamental when it is "rooted in the traditions and conscience of our people."[102] Any substantive due process "analysis must begin with a careful description of the asserted right."[103]  Failing to define the right with "the utmost care" risks "breaking new ground in this field."[104]  The Eighth Circuit is wisely "wary of extending substantive due process into new arenas."[105]  Without any indication from a superior court that the specific right at issue here should be considered fundamental, I decline to take another step down that adventurous path.

---

by federal law and therefore not authorized by Act 1110.  The Court is not saying that every prisoner be given a post-deprivation trial-type hearing.  But Eighth Circuit precedent demands that there be something more efficient than an eventual suit in the Arkansas Claims Commission.

[100] *Birchansky v. Clabaugh*, 955 F.3d 751, 757 (8th Cir. 2020); *United States v. Ali*, 799 F.3d 1008, 1031 (8th Cir. 2015) (legislation regarding sentencing for convictions is reviewed under rational basis). Prisoners are not a suspect class.  *Murray v. Dosal*, 150 F.3d 814, 818 (8th Cir. 1998).

[101] *Parrish v. Mallinger*, 133 F.3d 612, 614-15 (8th Cir. 1998) ("Legislation authorizing the paying of an inmate's restitution debt out of his prison account 'is reasonably related to a legitimate governmental purpose' and therefore satisfies the modern, highly deferential substantive due process standard.") (quoting *Honeywell, Inc. v. Minn. Life & Health Ins. Guar. Ass'n*, 110 F.3d 547, 554 (8th Cir. 1997) (en banc), *cert denied* 522 U.S. 858 (1997)).

[102] *Weiler v. Purkett*, 147 F.3d 1047, 1051 (en banc) (quoting *United States v. Salerno*, 481 U.S. 739, 746 (1987)).

[103] *Reno v. Flores*, 507 U.S. 292, 302 (1993).

[104] *Id.*

[105] *Weiler*, 137 F.3d at 1051.

In *Foster v. Hughes*, the Eighth Circuit upheld a state prison system's prohibition on inmates placing their money into private interest-bearing accounts.  There, the Court did not define the implicated right merely as the right to property, or even as the right to control one's money, but instead as "a right to earn interest on money."[106]  The Court concluded this was not a fundamental right and applied only the rational basis test.[107]  In *Weiler v. Purkett*, the Eighth Circuit sitting en banc rejected an inmate's claim that prison officials' refusal to deliver a package to him violated his constitutional rights.  There, the right at stake was precisely defined as "the entitlement to delivery of packages from family members."[108]  Again, the Court concluded this was not a fundamental right and applied only the rational basis test.

Here, the right at stake is not the right to own property.  It is the right of a prisoner to receive and spend generalized financial aid from the federal government.  It is true that when the government creates "an expectation in the receipt of general assistance for all people eligible," a property interest under the Due Process Clause has been created.[109]  While that interest is entitled to procedural due process, it is not fundamental for purposes of the substantive due process doctrine.[110]  The Eighth Circuit has previously stated, for example, that "[w]elfare benefits are not available as a fundamental right."[111]  No fundamental right has been abrogated here.

---

[106] *Foster v. Hughes*, 979 F.2d 130, 132 (8th Cir. 1992).

[107] *Id.*

[108] *Weiler*, 137 F.3d at 1051.

[109] *Daniels v. Woodbury Cnty.*, 742 F.2d 1128, 1133 (8th Cir. 1984).

[110] *See Brown v. Nix*, 33 F.3d 951, 954 (8th Cir. 1994).

[111] *Alcala v. Burns*, 545 F.2d 1101, 1105 (8th Cir. 1976) (denying an equal protection claim) (citing *Lavine v. Milne*, 424 U.S. 577 (1976)).

*4. Takings Clause*

The State of Arkansas may not take private property for public use without just compensation.[112]  Money is property protected by the Takings Clause.[113]  When money is taken from a citizen pursuant to an official policy for public use, just compensation is required.  This simple concept is one of the great bulwarks of freedom against state tyranny.

The ADC officials argue that confiscation of the prisoners' stimulus funds does not constitute a taking because there is no pecuniary loss for the prisoner.  To the extent their position is decipherable, the ADC officials appear to be arguing that (1) using a prisoner's funds to force him to pay his outstanding debts provides him with a dollar-for-dollar benefit, and (2) using a prisoner's funds to bulk up the inmate welfare fund and the Inmate Care and Custody Fund Account provides a collective benefit that matches the individual monetary "contributions" from a prisoner.

The first argument misses the mark a little bit, but it is within the realm of reason.  The dollar-for-dollar benefit is not relevant to whether a taking has occurred.  But it is relevant to whether the taking is without just compensation.  "Just compensation normally is to be measured by 'the market value of the property at the time of the taking.'"[114]  Here, the calculation is quite simple since the property to be taken is money.  As far as the portion of the monies used by ADC officials to pay off Mr. Lamar's fines, fees, or restitution, he will be compensated with a dollar-for-dollar benefit.  That qualifies as just compensation under our fairly loose precedents.  This

---

[112] U.S. Const. am. V; *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 122 (1978) (The Fifth Amendment's Takings Clause "is applicable to the States through the Fourteenth Amendment.").

[113] *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 616 (2013) (discussing "cases in which we treated confiscations of money as takings despite their functional similarity to a tax"). The ADC officials argue that prisoners have no property interest in money.  That's absurd and not what either Arkansas law or Eighth Circuit precedent say. *See supra* notes 61-62 and accompanying text.

[114] *Horne v. Dep't of Agric.*, 576 U.S. 350, 369 (2015) (quoting *United States v. 50 Acres of Land*, 469 U.S. 24, 29 (1984)).

form of just compensation may not be to Mr. Lamar's liking, but the Constitution does not require Mr. Lamar to be happy with the form of the compensation provided.[115]

The ADC official's second argument is a different story entirely.  Several words come to mind to describe this argument: dystopian, Orwellian, Kafkaesque.  To state the obvious, which apparently needs stating, "a State, by *ipse dixit*, may not transform private property into public property without just compensation."[116]  When ADC officials take a prisoner's money and put it into funds to be used by the ADC partially for the collective benefit of all prisoners and partially for ADC's general operating expenses, they commit a classic taking.  It is no less a taking because some of the money goes into the "inmate welfare fund" and such fund "shall be used for the general benefit of the inmates."[117]

The ADC's fallback position is basically a repackaging of the just-discussed argument.  The ADC argues that, even if the Court considers the confiscation of the prisoners' funds a taking, there has been and will be just compensation for the taking.  But the only "compensation" alleged by the ADC officials is that "the 'inmate welfare fund' shall be used for the general benefit of the inmates."[118]  While the Constitution might not officially pick sides in the philosophical battle between communism and capitalism, this line of thinking is emphatically more Marx than Madison.  There is no evidence whatsoever that shows that whatever *personal* benefits Mr. Lamar will receive in return for his forced "contribution" to the collective purse match or exceed the

---

[115] When the government exercises its power of eminent domain to take someone's house, the little money paid for it is usually cold comfort.  But, at least under current Supreme Court precedent, the government nonetheless satisfies the Takings Clause when it pays that person the monetary equivalent of their real property.

[116] *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 164 (1980).

[117] *Lamar Case Docket*, Defs.' Br. in Supp. of Mot. to Dismiss (Doc. 16) at 8 (quoting Ark. Code Ann. § 12-29-107).

[118] *Id.*

money he must give up. [119]  Thus, Mr. Lamar is more likely than not to succeed on the merits in proving that there will imminently be a taking without just compensation.

## B. SOVEREIGN IMMUNITY AND THE THREAT OF IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY INJUNCTION

Mr. Lamar's likelihood of success on the merits of his procedural due process and Takings Clause claims is not enough on its own to support a preliminary injunction against the ADC officials.  There must be a real and serious risk of irreparable harm to Mr. Lamar if he is denied a preliminary injunction.[120]  Generally, a temporary loss of income is not enough to establish irreparable harm.[121]  But that general rule is based on the expectation that the party seeking a preliminary injunction will *eventually* be made whole if they win a lawsuit.[122]  Because Mr. Lamar would be trying to get money back from state officials, the analysis is far more complicated.

Mr. Lamar is suing state officials in their official capacity under 42 U.S.C. § 1983.  If this Court does not grant a preliminary injunction, and thus the ADC officials are free to confiscate his incoming stimulus payments and disburse them according to Act 1110, Mr. Lamar's suit for prospective injunctive relief would have to become one for compensatory relief.  Mr. Lamar would be seeking relief from the government's general treasury.  A suit against a state official for money in federal court raises the specters of Eleventh Amendment immunity, state sovereign immunity,

---

[119] Even under the ADC officials' theory there is not full compensation.  Only half of Mr. Lamar's excess stimulus funds will go to the inmate welfare fund.  The other half goes to the Inmate Care and Custody Fund, which is essentially the ADC's general operating fund.  Ark. Code Ann. § 19-5-302(1)(A) (2019) ("The Division of Correction Inmate Care and Custody Fund Account shall be used for the maintenance, operation, and improvement of the Division of Correction in carrying out those powers, functions, and duties relating to nonfarm or crop-producing programs as established by law.").

[120] *Dataphase Sys., Inc.*, 640 F.2d at 114.

[121] *See Adam-Mellang v. Apartment Search, Inc.*, 96 F.3d 297, 300 (8th Cir. 1996) ("[L]oss of income from being placed on administrative leave is not irreparable injury because she has an adequate remedy at law, namely, the damages and other relief to which she will be entitled if she prevails in this action.").

[122] *Id.*

and qualified immunity, each of which would very likely doom Mr. Lamar's chances of recovering his stimulus money.

But there is a small ray of hope for Mr. Lamar.  When a plaintiff sues a state official and asks for money as part of the requested relief, it is most often a suit for legal monetary damages. But not always.  Mr. Lamar's requested relief would really be for restitution, an equitable remedy. And, at least if the funds at issue are maintained in the sequestered account described in the Background Section, immunity will not shield state officials sued for equitable relief.[123]  If, however, the funds are disbursed to the inmate welfare fund or to the Inmate Care and Custody Fund Account, even this type of equitable relief cannot be pursued.  Once that happens, the State of Arkansas's Eleventh Amendment immunity would shield the ADC officials and bar Mr. Lamar from relief in federal court and state sovereign immunity would keep him out of state court.[124] This is because, as further discussed below, the inmate welfare funds and Inmate Care and Custody Fund Account are the equivalent of or part of the general state treasury.  The sequestered account is not.

---

[123] *Chauffeurs, Teamsters, and Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 570-71 (1990) (explaining that damages are equitable when they are "restitutionary," such as the return of "money wrongfully held by" the defendant); *Hopkins v. Saunders*, 199 F.3d 968, 976-77 (8th Cir. 1999) *(Hopkins II)* (stating that monetary awards in § 1983 suits are equitable when "restitutionary" in nature, such as when "restoring to [a plaintiff] anything that was rightfully his"); *Grantham v. Trickey*, 21 F.3d 289, 295 (8th Cir. 1994) ("There is no dispute that qualified immunity does not apply to claims for equitable relief, and that state officials may be sued in their official capacity for equitable relief.") (internal citations omitted).

[124] *Campbell v. Ark. Dep't of Corr.*, 155 F.3d 950, 962 (8th Cir. 1998) (holding that equitable remedy of front pay unavailable because it would be paid out of the state treasury); *Pennhurst State School & Hosp.*, 465 U.S. 89, 101-02 (1984) ("[A] suit against state officials that is in fact a suit against a State is barred regardless of whether it seeks damages or injunctive relief."); *Fryberger v. Univ. of Ark.*, 889 F.3d 471, 473 (8th Cir. 2018) ("Eleventh Amendment and constitutional principles of sovereign immunity" bar suits against a State in federal court unless the State consents to being sued.); *Hopkins v. Saunders*, 93 F.3d 522, 526 (8th Cir. 1996) *(Hopkins I)* (Eleventh Amendment immunity will shield a state official when a judgment against the state official will protect the state treasury.); *Bryant v. Ark. State Highway Comm'n*, 233 Ark. 41 (1961) (holding that state sovereign immunity barred takings claim); Ark. Const. art. V, § 20 ("The State of Arkansas shall never be made defendant in any of her courts.").

Currently, equitable restitution is still a possibility for Mr. Lamar.  The confiscated stimulus funds are sitting in an ADC bank account created solely to hold those funds.[125]  There is nothing in the record to indicate that this particular account was created by statute, that expenditures from this account are subject to legislative approval, or that the account is "subject to several restrictions under state and federal law."[126]  Instead, this account is comprised entirely of "non-state funds under the agency's discretionary control."[127]  Therefore, this account should not be considered "part of the state treasury."[128]  So long as confiscated stimulus funds remain in this account, a future ruling requiring repayment of stimulus funds from this account would be equitable restitution, not monetary damages, and would not implicate the ADC officials' qualified immunity, Arkansas's Eleventh Amendment immunity, or state sovereign immunity.[129]  But if the ADC were to disburse the monies in the sequestered account, the harm would be irreparable.

The ADC officials' best argument is that Mr. Lamar will always have a remedy to get his money.  Even if qualified immunity, Eleventh Amendment immunity, and state sovereign immunity all barred Mr. Lamar from seeking restitution in federal and state courts, he would still have a remedy available in the Arkansas Claims Commission.  That is true.  Indeed, the affected prisoners would be well-served to avail themselves of such a remedy in a timely manner.  A takings

---

[125] *Master Case Docket*, Declaration of Jeffrey Jerry (Doc. 74) at 2.

[126] *See Hopkins I*, 93 F.3d at 527.

[127] *Id.*  During a hearing on this Motion, the attorney for the ADC officials conceded, in passing, that the funds were sequestered because it is possible they will have to return the funds if they lose this lawsuit. The fact that the ADC has the discretion to hold the funds in stasis instead of immediately disbursing them to the inmate welfare funds and Inmate Care and Custody Fund Account is further evidence of the fact that the funds in this account have not yet become part of the state treasury.

[128] *Hopkins I*, 93 F.3d at 527.

[129] For all the claims, part of the likelihood of success analysis includes determining whether sovereign immunity would prevent the litigation of the claim.  If it would, Mr. Lamar's likelihood of success plummets.  But, under the very unique circumstances present in this case, sovereign immunity is not likely to bar the claims assuming a preliminary injunction is entered keeping the funds in the sequestered account.  Indeed, even the ADC considers the potential recoupment of funds from the sequestered account to not count as monetary damages.  *See Master Case Docket*, Declaration of Jeffrey Jerry (Doc. 74) at 2.  So Mr. Lamar's likelihood of success remains high.

claim brought against a state official in federal court has significant potential pitfalls that might preclude recovery down the line.  A timely takings claim in the Arkansas Claims Commission, on the other hand, is a much more traditional and straight forward bite at the apple.

But this is irrelevant for the purposes of considering irreparable harm here in federal court. When determining whether a post-injury remedy means the harm is not irreparable, federal courts only consider remedies which they have the power to enforce.[130]  If this Court does not grant a preliminary injunction and Act 1110 is fully carried out by the ADC officials, Mr. Lamar is likely to suffer irreparable harm as any claim would be barred in federal court because it would operate against the state treasury.

### C.  BALANCING THE EQUITITES AND CONSIDERING THE PUBLIC INTEREST

Finally, the Court must balance the threatened harm to Mr. Lamar against the harm to the government if an injunction is granted.[131]  The harm to the government is dependent on the nature and scope of the injunction itself.  A preliminary injunction preventing all enforcement of Act 1110 could cause significant harm to the ADC officials and the State of Arkansas.  For one, it would prevent "implementation of a duly enacted state statute."[132]  A no-enforcement injunction would also allow Mr. Lamar to deposit and immediately spend his money, giving him "the relief [he] would obtain after a trial on the merits."[133]  This could prove especially harmful to the government because, if it wins this lawsuit, the money would be gone and the victory would thus be hollow.

---

[130] *Petroleum Expl. v. Pub. Serv. Comm'n of Ky.*, 304 U.S. 209, 217 (1938) ("It is settled that no adequate remedy at law exists, so as to deprive federal courts of equity jurisdiction, unless it is available in the federal courts.").

[131] *Dataphase Sys., Inc.*, 640 F.2d at 114; *see also Nken*, 556 U.S. at 435 (stating that the harm to the interests of the nonmovant and the public interest factors merge when the motion is against the government).

[132] *Planned Parenthood Ark. & E. Okla. v. Jegley*, 864 F.3d 953, 957-58 (8th Cir. 2017).

[133] *Dakota Indus., Inc.*, 944 F.2d at 440.

On the other hand, an injunction tailored to "maintain the status quo" would appropriately safeguard the interests of both Mr. Lamar and the government.[134] Mr. Lamar and the other inmates are likely to succeed only on claims regarding the monies left over after payment of court fines, fees, costs, or restitution. So only that portion of the sequestered account should be frozen. An injunction allowing the ADC officials to continue collecting the stimulus payments, continue depositing the funds into the sequestered account, and continue using an inmate's funds to pay off his debts would still allow Mr. Lamar (and the other inmates) to recover the leftover funds at a later date if they succeed on the merits of their claims. Likewise, the money would not be spent by Mr. Lamar (or the other inmates), so, if the ADC officials are victorious, they will be able to enforce Act 1110 without losing any of the stimulus funds. While such a freeze would hamper the ADC officials' ability to fully carry out all of Act 1110, it does not stop them from doing what they are currently doing, and it does not disrupt their plans for the immediate future. On balance, this type of limited injunction appropriately protects both parties and maintains the status quo.[135]

## SCOPE OF PRELIMINARY INJUNCTION

The Court finds that Mr. Lamar has a high likelihood of success on the merits of his procedural due process and Takings Clause claims, that Mr. Lamar is likely to suffer irreparable harm without a preliminary injunction, and that a limited injunction tailored to maintain the status quo does not improperly harm the ADC officials' or State of Arkansas's interest. The Court has consolidated Mr. Lamar's case with dozens of other cases brought by inmates and has selected Mr.

---

[134] *Ferry-Morse Seed Co. v. Food Corn, Inc.*, 729 F.2d 589, 593 (8th Cir. 1984).

[135] The Court recognizes that in *Knick v. Township of Scott*, the United States Supreme Court noted that "as a practical matter . . . barring the government from acting will ordinarily not be appropriate" for imminent Takings Clause violations "[g]iven the availability of post-taking compensation." 139 S.Ct. 2162, 2177 (2019). However, Knick involved a township, and therefore the immunity doctrines did not complicate the post-injury remedies the way they do in this case. *Id.* Considering this, an injunction that only partially bars government action while still protecting the ultimate interests of the eventually successful party is appropriate.

Lamar's case as one of three test cases for purposes of motions practice. The legal issues presented by those other cases essentially mirror this case. Many of those cases seek, as this case seeks, certification of a class of all Arkansas inmates. While the Court has not yet appointed counsel for the pro se plaintiffs (aside from Mr. Hayes), it envisions doing so soon, and then probably certifying a class. Under these circumstances, it is appropriate for the injunctive relief to cover all prisoners to whom Act 1110 applies.

The Court therefore GRANTS Mr. Lamar's Motion for Preliminary Injunction on the following terms.

ADC officials may continue to collect inmates' federal relief and stimulus funds pursuant to Act 1110 *only if the funds are deposited into the sequestered account*. Otherwise, they may not do so.

ADC officials shall continue to maintain records of (1) which inmate's funds have been deposited into this sequestered account, (2) how much of each inmate's federal relief or stimulus funds have been deposited into the sequestered account, and (3) how much of each inmate's funds in the sequestered account have been used to pay court fines, fees, costs, or restitution.

ADC officials may use funds from this sequestered account to pay off an inmate's court fines, fees, costs, or restitution pursuant to Act 1110.

ADC officials may return any confiscated federal relief or stimulus funds to the inmate from which they were confiscated if (1) the ADC officials wish to do so, or (2) if ordered to do so by a state court, the Arkansas Claims Commission, or a federal court.

*ADC may not otherwise use in any manner or disburse the funds in the sequestered account. It must hold them in the sequestered account until the end of this lawsuit. To be clear,*

*ADC may not place or re-direct any stimulus funds in the inmate welfare fund, the Inmate Care and Custody Fund Account or any location other than the sequestered account.*[136]

IT IS SO ORDERED this 3rd Day of September 2021.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

[136] Given the limited nature of the injunction, the Court finds that the proper amount of security is $0. *See* Fed. R. Civ. P. 65(c).